**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Jacqui Ferderer, | ) | **ORDER RE MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No.: 1:05-cv-019 |
| State of North Dakota and Leo Reinbold, in | ) | |
| his individual and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

_____

Plaintiff Jacqui Ferderer ("Ferderer") commenced this action on February 10, 2005, against the State of North Dakota ("State") and former North Dakota Pubic Service Commissioner Leo Reinbold ("Reinbold"), both in his individual and official capacities, alleging gender discrimination in violation of Title VII of the Civil Rights Act, violations of 42 U.S.C. § 1983, and various state law claims.[1]

The state law claims were later dismissed in favor of an action filed in state court. Also, Reinbold reached a settlement with Ferderer and was dismissed from the action. Consequently, the sole remaining defendant is the State and the remaining cause of action is gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*.

Before the court is the State's motion for summary judgment. Unless otherwise indicated, the facts set forth below have been construed most favorably for Ferderer.

_____

[1]  The state-law claims were violation of the North Dakota Human Rights Act, intentional infliction of emotional distress, negligent infliction of emotional distress, and assault and battery.

# I.      BACKGROUND

## A.      The parties

Ferderer is employed as an administrative assistant in the office of Karen Tyler, the State's securities commissioner.  She reports directly to Commissioner Tyler.

The securities commissioner is a legislatively-created, as opposed to constitutionally-created, executive branch officer.  The securities commissioner is appointed by the governor for a four-term, subject to confirmation by the senate.  N.D.C.C. § 10-04-03.  The securities commissioner's office is relatively small; only eight or nine persons were employed in the office when the events in this case took place.

Reinbold was an elected public service commissioner.  The North Dakota Constitution mandates that, within the executive branch, there shall be three publicly-elected public service commissioners whose powers and duties are to be determined by the legislature.  N.D. Const. Art V, § 2.  Pursuant to this mandate, the legislature created the public service commission ("PSC"), which is compromised of the three public service commissioners.  N.D.C.C. 49-01-02.  The legislature has also enacted statutes that govern the PSC's operations and define its jurisdiction. See generally N.D.C.C. chs.  49-01 & 49-02.

Reinbold was a well-recognized figure around the capitol, having served as a PSC commissioner for many years and being at that time one of the longest-serving public utility commissioners in the country.  Reinbold was pressured into retirement because of the incidents occurring in this case, as well as other incidents that were brought to light as result of what happened.

2

The securities commissioner's office is located on the fifth floor of the tower portion of the State Capitol and the PSC's offices are located on the twelfth and thirteenth floors.  All elected state officials and the chief-executive officers of the principal departments are required to maintain their offices in the Capitol.  N.D. Const.  Art. V, § 6.

**B.    Alleged incidents**

**1.    First incident**

In late February or early March 2003, Ferderer states she encountered Reinbold in the hallway of the Capitol on the ground floor.  She claims Reinbold asked her if she was "being good" and she responded by asking him if he was being good.  Reinbold then allegedly told her that his secretary was not in the office and that she should come up "to play games."   Ferderer states she then asked him what kind of games he was talking about and that Reinbold answered "we can make them up as we go along."   After this comment, Ferderer states that they both entered the elevator where he then proceeded to bend down and kiss her on the cheek while the elevator was en route to the fifth floor.  No one else was on the elevator.  Ferderer states that, before she could get off the elevator, Reinbold kissed her on the cheek a second time.  See Docket No. 30, Deposition of Jacqui Ferderer ("Ferderer Dep.") at 12-19; Docket No. 30, Laurie Hammeren Deposition ("Hammeren Dep.), ex. 1A , Investigation Report dated April 1, 2003 ("First Investigation Report").

**2.    Events following the first incident**

Shortly afterwards, Ferderer reported to Diane Lillis, a co-worker in the securities commissioner's office, what happened   The evidence is disputed as to exactly what the conversations were between Ferderer and Lillis.  In an affidavit filed in this action, Lillis states that Ferderer told her about the incident because Lillis knew Reinbold casually through political circles.

She states that Ferderer seemed embarrassed but not overly upset and claims that Ferderer told her not to mention what happened to anyone else.  Finally, Lillis states that, despite what she understood to be Ferderer's request not to mention it to anyone, she felt compelled to call PSC Commissioner Tony Clark, another political acquaintance, to tell him about the incident anyway.  See Docket No. 42, Affidavit of Diane Lillis ("Lillis Affidavit).

It appears that part of the reason why Lillis called Commissioner Clark was because she also had been the subject of an unwanted advance by Reinbold in the fall of 2002.  On that occasion, Lillis was leaving the Capitol to go to lunch and met Reinbold at the north entrance to the Capitol tower.  Reinbold opened the door for her and then kissed her on the lips.  Lillis claims she thought it was strange, but not something she felt had to be reported.  See Lillis Affidavit.

Ferderer disputes, in part, Lillis's account of their conversations.  Although her deposition testimony is unclear, and at points may be contradictory, she suggests in her deposition, and again in an affidavit filed with the court, that the reason she told Lillis was because Commissioner Tyler was not in the office that day and  because her understanding from her conversation with Lillis was that Lillis was going to call PSC Commissioner Clark to report what had happened.  She also states in her affidavit that she approved Lillis calling Clark.  See Ferderer Dep. at 51-52; Docket No. 52, Affidavit of Ferderer ("Ferderer Affidavit).[2]

---

[2]  At her deposition, Ferderer testified at another point that she did not intend to tell Commissioner Tyler, but it is unclear whether or not this was because she was of the understanding that the matter was being reported to PSC Commissioner Clark.  Also, she was asked the following question:

> Q.    I believe there was some indication that you initially did not want Diane [Lillis] to make any
>        phone call or have any conversation with Tony Clark.
> A.    Yes.

(Ferderer Dep. at 61) This question and answer was not further pursued and it is unclear whether Ferderer was referring to post-incident accounts given by Lillis or whether she was referring to the initial conversation she had with Lillis. Further, assuming it is the latter, this may not be inconsistent with her affidavit because there are several other possibilities.  One is that she initially told Lillis not to mention it to anyone, but that Lillis convinced her that at least Commissioner Clark should be told.  Another possibility is that she told Lillis she did not want her to tell anyone, but

4

Lillis does not say anything in her affidavit about whether she told Ferderer about the fact that she had called Commissioner Clark and what Clark's response was.  However, Ferderer appears to suggest in her affidavit that Lillis later told her about her conversation with Clark.  This is also consistent with what Ferderer stated earlier in a complaint filed with the North Dakota Department of Labor on December 11, 2003, before litigation was commenced.   In that filing, Ferderer stated that Lillis immediately called Clark and suggested that someone had to do something about Reinbold because this had been going on for sometime.  She also states that Lillis's comment to Clark specifically was that someone had to put a "leash on this guy once and for all."  Ferderer also claims that Clark's response to Lillis after being advised of the incident was "Oh gross."  See Ferderer Dep., ex. 2.

While there are disputed issues of fact as to what Ferderer told Lillis and what Ferderer's understandings were in terms of what Lillis was going to do, there is no dispute about the fact that Ferderer did not inform Commissioner Tyler about the first incident, at least initially.  The only other person she told at that time was her husband.  See Ferderer Dep. at 43-45.

The securities commissioner did not have any formal, written policies in place dealing with sexual harassment at the time of the first and second Ferderer incidents.  Commissioner Tyler states in an affidavit that she filed with this court that she maintained an "open door" policy and that her employees were advised to come to her anytime they had a problem.  One of Ferderer's contentions now is that she and Lillis would likely have handled things differently, and that this in turn would likely have resulted in an earlier investigation and discovery that Reinbold was a serial harasser, had

---

Lillis told her she was going to call Commissioner Clark and that Ferderer agreed provided that Lillis did not identify her.

5

there been an effective sexual harassment policy in place.  See Docket No. 43, Affidavit of Karen Tyler ("Tyler Affidavit").

As it turned out, Commissioner Tyler had her own encounter with Reinbold, also in a Capitol elevator, in February 2003, which most likely was just prior to the first Ferderer incident.  The investigation report prepared following the second Ferderer incident states that Commissioner Tyler told investigators that, in February 2003, Reinbold stepped close to her in one of the Capitol elevators and stated "it's just the two of us."  See First Investigation Report.

Thus, with the occurrence of the first Ferderer incident, Reinbold had managed, within less than six months, to either assault or make questionable remarks to not only Ferderer, but also Lillis and Tyler.  This represents one-third of the total persons employed within the securities commissioner's office, and, if only female employees are considered, the percentage is undoubtedly much higher.

In an affidavit filed with the court, Commissioner Clark acknowledges that Lillis called and told him about the first elevator incident involving Ferderer, but without disclosing Ferderer's identity.  Clark states that he asked Lillis what she wanted him to do and was advised that the individual accosted was not making a big deal out of the matter and did not want it pursued.  Clark, who at that point had been a commissioner for only about two years, states in his affidavit that he had never witnessed nor been made aware of any complaints by "PSC employees" of Reinbold engaging in any inappropriate or harassing behavior.[3]  See Docket No. 36, Affidavit of Anthony Clark ("Clark Affidavit").

---

[3] There is some suggestion in the cross-examination of former PSC executive secretary Mielke that a female employee of the PSC complained to Commissioner Clark about sexual harassment in the office, but no specific information has been presented to the court.  See Mielke Dep. at 108-110.

Clark's affidavit does not say one way or the other whether Lillis told him she also had been accosted by Reinbold within the last several months.  However, if Lillis felt compelled to tell Clark about what happened to Ferderer, it seems probable she would also have mentioned what had happened to her either directly or indirectly by stating this had occurred on other occasions.

Clark states in his affidavit that he discussed what he had been told by Lillis with both PSC Commissioner Wefald and then PSC executive secretary Jon Mielke.  As discussed later herein, there is evidence indicating that both Wefald and Mielke had some knowledge of prior inappropriate conduct on the part of Reinbold and it is unclear whether any of this information was shared with Clark and discussed in the context of the incident or incidents reported by Lillis.  Clark states he reached a consensus with Commissioner Wefald  and  Mielke that there was nothing they should do because the report had been made by an unnamed person who was not a PSC employee, the incident did not occur within the Commission's workplace, and the incident did not involve PSC business. See Clark Affidavit.

In his deposition, Mielke's recollection was that Clark talked to both he and Wefald separately.  His testimony, for the most part, was consistent with Clark's recollections.  However, when asked whether it was concluded that Clark would talk to Reinbold, he stated he could not recall.  Further, it was his recollection that Clark was going to call back the person who had called him.  Mielke was also asked what he would tell a person, who reported being assaulted by a PSC employee if the PSC had decided to take no action, and he responded that he would refer the person to "Central Personnel" (which is now known as Human Resource Management Service or "HRMS"), since they are the experts.  See Docket No. 30, Deposition of Jon Mielke ("Mielke Dep.") at 100-106.

There is no evidence of any action being taken within the PSC as result of the information conveyed by Lillis regarding the first Ferderer incident.  More specifically, there is no indication the matter was discussed with the PSC's in-house counsel, the attorney general's office, the governor's office, or the personnel specialists at HRMS.  And, perhaps most significantly, there is no evidence that anyone confronted Reinbold with the accusations.  Finally, there is no indication that Clark called Lillis back and told her that no action was being taken.

### 3.    Second Ferderer incident

On March 14, 2003, approximately two weeks after the first incident, Ferderer states she got off the Capitol elevator to go to the mail room, which is located on the ground floor.  She states she saw Reinbold by the elevators and he said "hello" to her.   She states she did not return the greeting and proceeded to walk past him to the mail room.    See Ferderer Dep. at 19-22; First Investigation Report.

After finishing her work in the mail room, Ferderer states she returned to the elevators about five minutes later and found Reinbold still standing there.  Ferderer states that she was hesitant to get on the elevator with Reinbold, but decided to proceed anyway because she was busy.   After they entered the elevator, Ferderer reports that Reinbold grabbed the back of her head forcibly and kissed her hard on the mouth.   Ferderer states she told Reinbold "no" and pushed him back, to which he allegedly responded "that was sweet" and then grabbed and kissed her hard on the mouth a second time.  Ferderer states she exited the elevator as soon as it stopped and that  Reinbold called out after her, requesting that she come to see him at his office.  Id.

### 4.    Events following second incident

Ferderer immediately reported the second incident to Commissioner Tyler and also advised that this was the second time she had been accosted. Tyler took immediate action.  Within minutes, she contacted the governor's office, which resulted in an investigation being launched by the North Dakota Highway Patrol with the assistance of HRMS, which is discussed in more detail below. She also arranged to have another employee handle Ferderer's mail responsibilities so as to lessen the possibility of future contact with Reinbold outside the securities commissioner's office and had an alarm placed at Ferderer's desk so she could alert the North Dakota Highway Patrol if Reinbold came to their offices.  Tyler also arranged for Ferderer to be given a state-provided cell phone so she could contact someone if she encountered Reinbold away from her desk.  See Tyler Affidavit.

Following the investigation conducted by the Highway Patrol and HRMS, the matter became public.  Reinbold denied the charges in the Bismarck Tribune and branded Ferderer as a liar. The governor's office exerted pressure on Reinbold to resign and he soon decided to retire.

On June 13, 2003, several women employed within the PSC met with Bill Bineck, the PSC's in-house attorney, to discuss the fact that they also had been harassed by Reinbold.  They said they were coming forward because they were upset about the fact that Ferderer had been savaged in the paper by Reinbold and because they did not want to be tasked to help with Reinbold's upcoming retirement party.  Bineck reported what was discussed with Commissioner Wefald and she then asked HRMS to conduct another investigation, this time focused  upon the employees within the PSC.  The results of this second investigation are discussed below.  See Hammeren Dep., ex. 1 ("Second Investigation Report"); Docket No. 33, Affidavit of William Binek.

Ferderer claims that from March until July 2003, the date Reinbold left office, she lost sleep and went to work fearing she would have another encounter with him. She states that she stopped taking coffee breaks and took alternate routes through the capitol building to avoid having to meet him. Also, some of her work duties were changed so she could avoid Reinbold, including the assignment of her mail duties to someone else. Finally, she states that the stress of these events triggered her multiple sclerosis, which she claims had been symptom free and in remission for some time, exacerbating her condition to the point that it is now difficult for her to walk and control her motor skills and that she must now take medication for the rest of her life. See Ferderer Dep. at 27-32, 38-40, 49-5; First Investigation Report.

### C.   Investigations, findings, and adoption of a new policy by the PSC

#### 1.   First investigation by NDHP and HRMS

On March 21, 2003, approximately a week following the report of the second incident to the governor's office, governor's legal counsel contacted the head of the Highway Patrol to request an investigation. Captain Bryan Klipfel was tasked to head the investigation and, on March 25, 2003, the governor's legal counsel provided him with the details of the accusations being made by Ferderer. Because the incident involved sexual harassment, Captain Klipfel contacted Laurie Sterioti-Hammeren, the director of HRMS, to assist in the investigation. See First Investigation Report.

On April 1, 2003, the Highway Patrol and HRMS concluded in a written report that the incidents involving Ferderer "likely occurred" because similar conduct was reported by others, *i.e*, Lillis and Tyler, and because they found Ferderer, Lillis, and Tyler to be credible. Id. It is unclear

whether the need for a speedy determination or a myopic view of the potential problem caused them not to question the PSC's own employees, as well as other women working in the Capitol tower.

### 2.    Second investigation by HRMS and the Highway Patrol

As already noted, a protest by a number of women working within the PSC resulted in a second HRMS investigation, which this time focused only upon the PSC's employees. This time Hammeren assigned Kim Wassim of HRMS to conduct the investigation. Captain Klipfel of the Highway Patrol also participated at the request of Commissioner Wefald. See Second Investigation Report.

In a written report dated June 24, 2003, HRMS made the following findings and conclusions with respect to the second investigation:

(1)    Inappropriate jokes and comments of a sexual nature

Most of the employees who were interviewed, other than Commissioner Wefald and Commissioner Clark, reported having heard Reinbold make inappropriate jokes and comments of a sexual nature. The conclusion was that Reinbold in fact made inappropriate jokes and comments of a sexual nature based on the number of people reporting that this occurred.

(2)    Kissing female employees

Three women in the PSC's office reported that Reinbold had kissed them inappropriately in the workplace. One incident occurred within the last year; the other two occurred years ago. The conclusion was that the events occurred based on the credibility of the individuals, the similarity of the reports, and the results of the previous investigation.

11

(3)     <u>Inappropriate touching and grabbing of female employees</u>

Four of the women interviewed stated that Reinbold had inappropriately touched or grabbed them.  One incident occurred within the last year with the others dating back a number of years.  The conclusion was that the events occurred.  Further, the investigators reported that:

It was obviously difficult for some of the women to relay this information; one woman cried and others were visibly upset during their interviews.

(4)     <u>Offensive gestures of a sexual nature</u>

One of the women interviewed stated that Reinbold made two offensive gestures to her.  The conclusion was that this complaint was credible.  The investigators also noted:

She had a difficult time demonstrating the gestures due to the sexual nature of the gestures and cried as she attempted to do this.

HRMS then reached the following conclusion stating:

Reinbold has exhibited a pattern of inappropriate jokes/comments and behavior since the time he was elected to the Public Service Commission to present.

See Second Investigation Report.

Following this conclusion, the second report reviewed the responsibilities of an employer under federal and state laws against sexual discrimination, and particularly the responsibilities of supervisors to follow up on reports of inappropriate comments and behaviors even when no formal complaint has been made.  A fair inference from this discussion and the report's recommendations is that HRMS concluded that the PSC's handling of the prior complaints and incidents was deficient.

The HRMS report recommended that: (1) Reinbold be encouraged or required to leave as soon as possible, (2) a sexual harassment prevention training for employees and supervisors, including elected and appointed officials, of the PSC be immediately scheduled, (3) the sexual

harassment police be reviewed and updated, (4) a meeting be conducted with employees after Reinbold left office, (5) employees be made aware that they do not need to attend any retirement functions, formal or informal, for Reinbold.  See Second Investigation Report.  Further, on September 8, 2003, HRMS followed up the report with a letter to the PSC advising that the "North Dakota State Government is committed to maintaining a work environment that is free from discrimination and intimidation."  The letter also stated, "In keeping with this commitment, it must be fully communicated that the State will not tolerate harassment of our employees by any supervisor, coworker, vendor, or customer."  See Hammeren Dep. at 110, ex. 6.

After these recommendations were made, the PSC adopted a new sexual discrimination policy with the assistance of HRMS.  Included within the new policy are specific provisions dealing with harassment by an elected or appointed official.  The new provisions require a supervisor to report harassment by an elected or appointed official to either the executive secretary, a commissioner, or HRMS and further require that HRMS conduct an investigation.  See Mielke Dep. at 61-67 & ex. 18.

### D. Other evidence of actual or constructive knowledge within the PSC

Commissioner Wefald and executive secretary Mielke both acknowledged they were aware of an earlier allegation of harassment by Reinbold when Clark reported the first Ferderer incident to them.  The earlier allegation involved a female PSC employee.  They had been advised that, in about 2000, this employee had taken to hiding from Reinbold, including hiding under her desk, to avoid having contact with him.  Both claim they understood this matter had been "resolved."  See Docket No. 35, Affidavit of Susan Wefald; Mielke Dep. at 80-85.

In addition, a fair inference can be drawn from statements made by Mielke to investigators during the second investigation and from his later deposition testimony that he believed Reinbold's inappropriate behavior was common knowledge around the PSC and that he had a general awareness of other possible incidents. See Mielke Dep. at 81-148, & exs. 20 & 21. Also, there is an indication that another female employee claims she told Commissioner Wefald that Reinbold had engaged in unwanted touching and grabbing. See Mielke Dep. at 109.

Finally, there is also evidence that lower-level supervisors within the PSC had knowledge of several complaints by females employed within the PSC. With respect to these incidents, there is evidence that would support a conclusion that there had not been sufficient followup and that the PSC had not kept appropriate records of these incidents. See Doc. No. 37, Affidavit of Susan Richter; Doc. No. 44, Affidavit of James Deutsch; Mielke Dep. at 80-86; 143-144 & exs. 19 & 21. In fact, one female employee, who is also law-trained, appears to have expressed the opinion to investigators that the PSC needed to acknowledge its role in the Reinbold problem and make a public apology to its employees, and also that there needed to be a workable process for disciplining and removing elected officials for engaging in this kind of wrongdoing. See Mielke Dep. at ex. 19.

### D.    Additional background

John Mielke was appointed the executive secretary of the PSC in May of 1994. Prior to that, he had worked at various staff and supervisor positions within the PSC for a number of years. As executive secretary, Mielke was the chief administrative officer for the PSC. Some of his responsibilities included personnel matters, overseeing the preparation of the budget, managing the budget, scheduling meetings for the PSC, and making sure that the meetings were properly recorded and that minutes were prepared. He was also responsible for preparation of the agency's policies,

including the PSC's nondiscrimination or sexual harassment policy.  See Mielke Dep. at 15, 26, 45-46 & ex.  D.

Laurie Sterioti-Hammeren is the director of HRMS, which was formally known as Central Personnel.  HRMS is a division of the Office of Management and Budget ("OMB") and shares its budget with OMB.  One of the main responsibilities of HRMS is to provide classification and compensation ranges to the approximately 6,400 classified workers for North Dakota and to provide training to new employees that covers: leave, benefits, holidays, employee assistance program, overtime, conflict of interest in political activity, drug free workplace, sexual harassment, personnel records, and Americans with Disability Act.  See Hammeren Dep. p. 21, 34, 37-40 62-63.

HRMS also provides professional human resource advice to the state agencies along with training, but does not direct or control personnel matters within the agencies.  HRMS also implements legislative policy by adopting rules.  Finally, HRMS is also involved with the appeals process that is available to state employees to challenge adverse employment actions, including discipline, demotion or termination.  After an internal grievance process is completed within a State agency or department, an employee has the right to appeal by filing the appeal with HRMS.  The appeal is then forwarded by HRMS to the Office of Administrative Hearings, where it is assigned to an Administrative Law Judge ("ALJ").  The ALJ makes the final employment determination for the State's classified workers and has the power to overrule an agency or department determination.  See Hammeren Dep. at 66, 70; Affidavit of Hammeren.

15

## II.     ANALYSIS

### A.     Governing law

The following well-established principles govern the court's consideration of the State's motion for summary judgment:

> Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such a showing shifts to the non-movant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d (1986). The non-movant "must show there is sufficient evidence to support a jury verdict in [her] favor." Nat'l Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir.1999). "Factual disputes that are irrelevant or unnecessary will not be counted," Anderson, 477 U.S. at 248, 106 S.Ct. 2505, and a mere scintilla of evidence supporting the nonmovant's position will not fulfill the non-movant's burden, id. at 252, 106 S.Ct. 2505.

Uhiren v. Bristol-Meyers Squibb Company, Inc., 346 F.3d 824, 827 (8th Cir. 2003).

Ferderer claims that the State should be held liable because she was subjected to a "hostile work environment" in violation of Title VII.  To prevail on a hostile-work-environment claim, Ferderer must show that (1) she belongs to a protected group, (2) she was subjected to unwelcome harassment, (3) a causal nexus exists between the harassment and her protected group status, (4) that the harassment affected a term, condition, or privilege of her employment, and (5) that her employer knew or should have known of the harassment and failed to take prompt and effective remedial action. E.g., Tatum v. Arkansas Department of Health, 411 F.3d 955, 959 (8th Cir. 2005); Williams v. ConAgra Poultry Co., 378 F.3d 790, 794-95 (8th Cir. 2004).

**B.**	**Whether the complaint must be dismissed because the Securities Commissioner employs less than 15 persons**

Under Title VII, employers that have less than fifteen employees are not covered by the Act based on the definition of "employer" in 42 U.S.C. § 2000e(b). E.g. Arbaugh v. Y&H Corporation, 546 U.S. __, 126 S.Ct. 1235, 1238-39 (2006). The State argues that Ferderer's employer is the securities commissioner for Title VII purposes and no one else.   If the State is correct on this point, then the case must be dismissed, because there is no dispute about the fact that less than fifteen persons were employed in the office of the securities commissioner during the time period relevant to this action.

The State's argument for considering the securities commissioner as Ferderer's only employer is based principally, but not exclusively, upon an argument that the securities commissioner heads a separate state agency; the fact that the securities commissioner has primary supervision over her employees, including the right to hire and fire - albeit not unfettered; and that she has the power to establish her own policies with respect to sexual harassment.

Ferderer responds to this argument by stating that her employer is the State of North Dakota, not the securities commissioner.  She also contends that, at the very least, the State is a co-employer who can also be subject to Title VII liability.

In support of her arguments, Ferderer points to the fact that the securities commissioner heads an executive office within the State, which is not a separate legal governmental entity, such as a county, municipality, or park district.  She also points to the significant involvement of the State in setting the terms and conditions of her employment, including the fact that her paycheck comes from the State and that she is a classified employee within the "state service."

Under 42 U.S.C. § 2000e(b), an employer means a "person." And, under § 2000e(a), the "term 'person' includes one or more individuals, governments, governmental agencies, [and] political subdivisions . . . ."

On its face, the statutory language provides little guidance as to who should be considered the employer in a situation: where you have an appointed executive officer of a state who is, in part, an embodiment of the state in terms of exercising a delegated share of its sovereign power; where the executive officer has significant, but not exclusive control, over the terms and conditions of employment, including hiring and firing; where the state also has significant involvement in the employment relationship with ultimate control resting with the legislature; and where the state legislature has <u>not</u> made the office headed by the executive officer a separate legal entity. Or, to put the issue somewhat differently, did Congress intend when it added states and political subdivisions to Title VII's coverage that the fifteen-person numerical requirement would apply to each office and department within a state's government - particularly offices and departments that are within the same branch of government, which, in this case, is the executive branch?

The United States Supreme Court has yet to provide guidance on this subject. And, somewhat surprisingly, there is almost no lower federal-court authority that is directly on point. Part of the reason for this may be that the answer is viewed by many as so obvious that the point is not often litigated. Another reason may be the case law that holds there can be more than one employer for Title VII purposes, which may make the precise point academic in many cases.

In terms of the Eighth Circuit, the court has held generally that Title VII does not preclude "the possibility that a person may have two or more employers for the same work." <u>Hunt v. State</u>, 297 F.3d 735, 742 (8th Cir. 2002). And, in terms of meeting the fifteen-person numerical

requirement, the Eighth Circuit has held that separate entities can be consolidated based on the following factors: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control." Artis v. Francis Howell North Band Booster Association, Inc., 161 F.3d 1178, 1184 (8th Cir. 1998), quoting Baker v. Stuart Broadcasting Co., 560 F.2d 389, 392 (8th Cir. 1977). These four factors are commonly referred to as the "NLRB test" because the factors are the ones used by the National Labor Relations Board to determine whether consolidation of separate entities is proper for matters subject to its jurisdiction. See id. While these cases are helpful in determining whether the State, or at least the executive branch of the State under the direction of the governor, can be aggregated with the securities commissioner for purposes of meeting the numerical requirement and also in addressing the question of whether the State is a co-employer, the cases do not provide any guidance with respect to who is Ferderer's primary employer for Title VII purposes. But, again that may be a distinction without a difference.

In support of its argument that each individual office and department of a state is a separate employer for Title VII purposes, the State refers the court to the Seventh Circuit case of Hearne v. Board of Education of the City of Chicago, 185 F.3d 770 (7th Cir. 1999). In that case, the Seventh Circuit stated the following:

> Title VII actions must be brought against the "employer." In suits against state entities, that term is understood to mean the particular agency or part of the state apparatus that has actual hiring and firing responsibility. See *EEOC v. State of Illinois*, 69 F.3d 167, 171-72 (finding that local school districts, not the State of Illinois, are the "employers" of public school teachers in Illinois for the purposes of Title VII); see also *Salvato v. Illinois Dept. of Human Rights*, 155 F.3d 922, 926 (7th Cir.1998). Neither the Governor's office, the State of Illinois as a whole, nor the IELRB is the "employer" for Title VII purposes of any of these plaintiffs, which is the end of this part of the case against these defendants.

Id. at 777.  If by this sweeping statement the Seventh Circuit meant to conclude that each executive office and department in a state government should be a separate employer, at least to the extent the office or department has actual hiring and firing responsibility, such a conclusion was unnecessary to the court's ultimate decision in Hearne.  This is because the plaintiffs in Hearne were not employees of a state executive officer or department, but rather were Chicago school teachers, local school board members, and the teachers' union.  In other words, they were a part of, or were affiliated with, a political subdivision legally separate from the state defendants in that case.

Further, the two cases cited by the Seventh Circuit as authority for the above-quoted language provide questionable support for a conclusion that each officer and executive department of a state government should be considered a separate employer for Title VII purposes.   In Equal Opportunity Commission v. State of Illinois, 69 F.3d 167 (7th Cir. 1995), the issue, like in Hearne, was whether the state could be held responsible to school teachers employed by a political subdivision.  The court concluded in that case that the state could not be held liable based on the particular facts.  But, the Seventh Circuit went on to state that there could possibly be a situation where the state exerted so much control over the employment relationship between the teachers and the local political subdivision that it could become the de facto employer.  69 F.3d at 171-172.

The other case cited by Hearne did involve a claim brought by persons employed by a state executive department, i.e., the Illinois Department of Human Rights.  In that case, which involved a claim of  age discrimination, the plaintiffs sued both the Department of Human Rights and the Illinois Office of Central Management Services.  Salvato v. Illinois Dept. of Human Rights, 155 F.3d 922 (7th Cir.1998).  The trial court dismissed the latter defendant based on the conclusion that its involvement was peripheral.  The Seventh Circuit affirmed the dismissal on this ground without

reaching the broader issue of whether the plaintiff could have simply sued the State of Illinois rather than naming two separate state agencies. The Seventh Circuit, however, did express some concern about the issue. In its opinion, the court noted that the ability to sue a state-related party on an age-discrimination claim is predicated upon the conclusion that the state's immunity under the Eleventh Amendment has been abrogated by the federal age-discrimination provisions, not the agency's immunity, and then observed that "at the most basic level the plaintiffs' action is against the State of Illinois as an 'employer.'" 155 F.3d at 925.

In addition to Hearne, the State also cites the court to the Seventh Circuit case of Holman v. Indiana, 211 F.3d 399 (7th Cir. 2001). In Holman, like in the earlier case of Salvato, the plaintiff sued the executive state agency with whom he was employed rather than the state. In a footnote to the opinion, a different panel of the Seventh Circuit stated:

> Although not raised by the parties, we assume the IDOT, and not the State of Indiana generally, has "actual hiring and firing responsibility" as to the Holmans and is thus their "employer" for purposes of Title VII. *Hearne v. Board of Educ. of City of Chicago*, 185 F.3d 770, 777 (7th Cir. 1999) ("Title VII actions must be brought against the 'employer.' In suits against state entities, that term is understood to mean the particular agency or part of the state apparatus that has actual hiring and firing responsibility."). As a result, the Holmans cannot maintain Title VII claims against the State of Indiana. *Id.* (holding that because "[n]either the Governor's office, the State of Illinois as a whole, nor the IELRB is the 'employer' for Title VII purposes ⋯ the case against these defendants [is at an end].").

211 F.3d at 401 n.7. But, in addressing this point, the court considered neither the facts of Hearne nor the authority it relied upon for the sweeping language used in that case. Further, the court in Holman cited no other authority for the conclusions reached in the footnote and the issue was never raised by the parties.

Given the foregoing, and for other reasons set forth below, the court respectfully does not find the cases from the Seventh Circuit that are relied upon by the State to be persuasive for the

proposition that state executive officers and departments should be considered separate employers for Title VII purposes. Also, it needs to be observed that none of the Seventh Circuit cases addressed the issue in the context of satisfying the threshold numerical requirement.

The State also cites to two decisions from the Eleventh Circuit, the first of which, in terms of time, is the *en banc* decision in Lyes v. City of Rivera Beach, Florida, 166 F.3d 1332 (11th Cir. 1999). In that case, the plaintiff, who was employed by a city redevelopment corporation, attempted to sue a city with whom the redevelopment corporation was associated for sex discrimination. The district court held that the plaintiff's claim could not go forward because the redevelopment corporation employed less than fifteen persons and that the redevelopment corporation and the city could not be aggregated to satisfy the fifteen-person numerical requirement. Id. at 1335.

One of the issues for the Eleventh Circuit, sitting *en banc* in Lyes, was whether it should employ the "NLRB factors" used by the Eighth Circuit or whether a new test should be adopted to determine the aggregation issue. The Eleventh Circuit ultimately decided that the NLRB test used by the Eighth Circuit, along with several other circuits, is not appropriate when considering whether governmental entities should be aggregated. The court held that "comity and federalism concerns" require that federal courts "accord substantial deference to a state lawmaking body's determination regarding whether two or more governmental entities are separate and distinct." Id. at 1344. It then held that, when a state legislative body creates a public entity and declares it separate and distinct, this creates a presumption against aggregation that can only be rebutted by a clear showing either: (1) that the purpose for maintaining nominally separate entities was to evade federal discrimination laws or (2) that the "public entities are so closely interrelated with respect to control

of the fundamental aspects of the employment relationship that they should be counted together under Title VII." Id. at 1345.

With respect to the latter exception, the Eleventh Circuit held the two NLRB factors of "interrelationship of operations" and "centralized control of labor operations" are still relevant and that, as indicia of control, the following agency-law factors could be considered: "the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments; [and] the obligation to pay or the duty to train the charging party." Id. The court then stated that its list of factors was not intended to be exclusive and that the decision should be made based on the totality of the circumstances. Id.

In applying its newly-crafted test to the facts, the Eleventh Circuit in Lyes concluded that the city should not be aggregated with the redevelopment corporation in that case based on a number of facts that led to the conclusion that there was not sufficient evidence of "interrelatedness with regard to control over employment. Id. at 1346. The court noted that: the redevelopment corporation retained control over the "fundamental aspects of employment" of its staff, including hiring, firing, and establishment of work schedules and assignments; the executive director was employed by the redevelopment corporation board and served at its pleasure; the employees of the corporation received their medical benefits, life insurance, and pension benefits from the corporation and not the city; and the fact the disciplining, suspension, and termination of the plaintiff in that case were done by the corporation and not the city. Id.

Even if the test in Lyes is applied in this case, the totality of the circumstances indicate that, the State, or at least executive branch under the control of the governor, should be aggregated with securities commissioner to meet the numerical threshold requirement.   This is because the

undisputed facts show there is an interrelatedness of operation.  Looking at the factors the Eleventh Circuit found significant in <u>Lyes</u> illustrates this point.  In this case, the securities commissioner is not appointed by anyone within the department that the State argues is distinct.  Rather, the commissioner is appointed by the governor, who is the chief executive of the State, subject to confirmation by the senate.  Further, the securities commissioner does not have uncontrolled rights to hire, discipline, and fire.  Hiring is controlled broadly by employment policies set by the legislature, including policies against discrimination and a classification system that mandates salary ranges, among other things, and is also subject to budgetary constraints imposed by the legislature. Likewise, the right to discipline and fire is constrained by the State's employment policies and ultimately is subjected to an independent review by an administrative law judge who makes his or her decisions based upon policies established by state law and not the securities commissioner. Finally, Ferderer's pay comes from the State and the State has exclusive control over benefits that are provided, including such things as health insurance and retirement.

Moreover, the State, in arguing that the test in <u>Lyes</u> should be applied in this case, glosses over one very significant point: the test developed in that case only applies after it has been concluded that the governmental bodies that are sought to be aggregated are separate and distinct. And, it is clear from the Eleventh Circuit's decision in <u>Lyes</u> that what should be primarily looked to is  whether the entities are "legally" distinct.  At several places in its opinion, the Eleventh Circuit makes reference to the fact that the state legislature made the redevelopment agency in that case a separate legal entity and only in a footnote observed that the entities were more than "formally distinct."  <u>Id.</u>  at 1343-48 & n.10.

As already noted, the Eleventh Circuit believes that federalism and comity concerns require giving "great deference" to the State's organization of "its governmental subdivisions." Id. at 1344.

In this case, the state legislature has not made the securities commissioner a separate legal entity. As discussed in more detail below, she is simply one of a number of executive officers of the State of North Dakota. Consequently, if "great deference" is given to the legislature's determination, then Lyes supports the position taken by Ferderer that her employer is the State for Title VII purposes and not the securities commissioner.

Finally, the State also cites the court to Laurie v. Alabama Court of Criminal Appeals, 256 F.3d 1266 (11th Cir. 2001). In that case, in deciding whether the Title VII's fifteen-person numerical threshold was met, the district court decided that all of Alabama's courts should not be aggregated with the Alabama Court of Criminal Appeals ("ACCA"). The district court held that the state legislature had made the ACCA a separate and distinct entity from the other courts and that it should not be aggregated with the other courts because it had authority over all aspects of the employment relationship and its own budget for operations. In a *per curiam* decision, the Eleventh Circuit affirmed.

Laurie comes closer to supporting the State's argument in this case that two different agencies should be considered separate and distinct, but still is distinguishable. For one thing, it does not appear the argument was made in Laurie that the ACCA was a not separate "legal" entity apart from the State of Alabama, as opposed to being merely separate from its other courts. Further, it appears clear from the decision that the ACCA had a significant degree of autonomy that is not present in this case with the securities commissioner. For example, under North Dakota law, not

only is the securities commissioner not legally an independent entity, she is also not autonomous in that she remains subject to the supervisory power of the governor, as explained more fully below.

Also, apart from the initial question of whether the ACCA was a separate and distinct entity under Alabama law, the facts in _Laurie_ in terms of application of the aggregation test are significantly different from the situation presented here.  For reasons already articulated, the securities commissioner does not have anything approaching total control over the employment relationship of the persons employed in her office.

Finally, the court is reluctant to place too much reliance upon the _per curiam_ decision in _Laurie_ given that there may be an unstated reason for the result, that is, a separation-of-powers concern. It may be that there are good reasons for distinguishing between state employees who are employed by a state's judiciary from those who are employed by the state's executive branch or  its legislature.  But, this is not the situation here since Ferderer is employed by an executive branch officer and the issue is whether the State, or at least the executive branch of the State, should be considered her employer or co-employer.

In this case, the following points are either undisputed or are beyond dispute:

- The executive power of the State of North Dakota is vested in the governor.  N.D. Const. Art. V, §§ 1 & 7.  As the "chief executive officer," the governor is obligated, among other things, "to see that the state's business is well administered and that its laws are faithfully executed" and to "supervise all necessary business of the state with the United States, the other states, and the officers and officials of this state." N.D. Const. Art. V, § 7.  Also, in addition to the governor's constitutional powers, the legislature has also commanded that the governor "shall supervise the official

conduct of all executive and ministerial officers." N.D.C.C. § 54-07-01(1). As a matter of law, the governor has supervisory authority over the securities commissioner.

- The securities commissioner is a non-constitutional office created by the state legislature. N.D.C.C. §§ 10-04-02(1) & 10-04-03. Under § 10-4-03(1), the governor appoints the securities commissioner, subject to confirmation by the state senate, for a four-year term, but the governor may remove the securities commissioner if the commissioner fails to discharge faithfully the duties of office. Id. Under § 10-04-03(1), the commissioner "may employ such employees as are necessary for the administration of this chapter."

- The legislature makes a specific appropriation each biennium to fund the activities of the securities commissioner, including specific appropriated amounts for salaries. See, e.g., 2005 N.D. Sess. Laws ch. 11; 2003 N.D. Sess. Laws ch. 32. The appropriated funds are held and controlled by the state treasurer, and it is the state treasurer who makes payment to the persons employed within the office of the securities commissioner. N.D.C.C. § 54-11-01.

- The state legislature has not made the securities commissioner or the commissioner's "office" a separate legal entity under North Dakota law. Compare, e.g., N.D.C.C. § 10-04-03 with § 11-10-01 (making counties separate legal entities for civil and political purposes) and § 40-01-02 (making cities separate bodies politic and corporate); cf., State ex rel. Holloway v. First Am. Bank & Trust Co., 186 N.W.2d 573, 574 (N.D. 1971). The only reasonable construction of North Dakota law is that

28

the securities commissioner is an executive branch officer, subject to the authority and supervision of the governor. As such, the securities commissioner is not only an agent of the State, she is, in part, an embodiment of the State given her delegated power to exercise a portion of the State's sovereignty.  See generally 63C Am. Jur. 2d Public Officers and Employees §§ 1-3.

- For any liability under state law, a claim against the securities commissioner for damages, either in her individual or official capacity, is deemed to be a claim against the State, except in cases of personal injury when the commissioner has acted outside the scope of her employment.  See, e.g., Fast v. State, 2004 ND 111, 680 N.W.2d 265 (personal injury claim against state university is a claim against the state); see generally N.D.C.C. chs. 32-12 & 32-12.2.   This also applies to claims for discrimination under North Dakota's Human Rights Act, which is codified at N.D.C.C. ch. 14-02 and which offers protections against discrimination that parallel federal law, including Title VII.  E.g., State v. Haskell, 2001 ND 14, ¶¶ 6-10, 621 N.W.2d 358; Cooke v. University of North Dakota, 1999 ND328, 602 N.W.2d 504. A monetary judgement against the securities commissioner in her official capacity can only be satisfied in the manner provided by N.D.C.C. §§ 32-12-04 or 32-12.2-04, depending upon the nature of the action, and is paid from legislatively appropriated funds or a special risk management fund maintained by the State pursuant to N.D.C.C. § 32-12.2-07.  The only exception would be judgments paid by insurance procured by the agency with the approval of the OMB.  Id.

- Ferderer is a "classified employee" in the "state service." N.D.C.C. § 54-44.3-20. While the securities commissioner has been delegated the power to make the initial hiring decision and has discretion with respect to a number of the aspects of the employment relationship, many of the terms and conditions of a classified employee's employment are set by the State, including salary range, overtime, benefits, reimbursement of expenses, and retirement. In fact, the relevant statutes refer to the employees as "state employees" or persons engaged in the "service of the state." See, e.g., § 54–6-09 (providing reimbursement for travel expenses for "[s]tate officials, whether elective or appointive, and their deputies, assistants, and clerks, or other state employees."); § 54-06-14 (providing for annual and sick leave for all persons "in the permanent employment of this state" and requiring employment units to adopt rules complying with the requirements of the section); § 54-06-24 (establishment of a suggestion incentive program for "state employees"); ch. 54-52 (establishing retirement program for public employees and distinguishing between "state" and "political subdivision" employees); ch. 54-44.3 (creation of a classified system for "service of the state").

  In addition, other provisions of state law limit the discretionary authority delegated to the securities commissioner with regard to employment matters. See, e.g., § 54-06-24.1 (prescribing rules and procedures for agency adoption of telecommuting by "state employees"); § 54-06-30 (authorizing agencies subject to constraints to pay performance bonuses to "state employees'); § 54-44.3.-01 (requiring that all appointments and promotions to positions in the "state classified

service" must be made without regard to "sex, race, color, national origin, age, religious affiliations, or political opinions on the basis of merit and fitness."). Also, the legislature has frequently dictated to state agencies how periodic salary adjustments must be paid, and a recent attorney general's opinion discussing this subject makes reference to the employees as "state employees." N.D.Atty.Gen.Op. 2006-L-19 (June 16, 2006). Finally, the power of the securities commissioner to discharge a classified employee is substantially constrained and subject to the review and final decision of an administrative law judge as set forth in N.D.C.C. § 54-44.3-12.2. See, e.g., Development Center, North Dakota Department of Human Services v. Central Personnel Division, Office of Management and Budget, 2000 ND 7, ¶ ¶ 8-9, 604 N.W.2d 230 (describing the appeals process for the dismissal of a "classified state employee").

The only reasonable conclusion that can be drawn from these points as a matter of state law is that Ferderer became an employee of the State once she was hired by the securities commissioner. The fact that the securities commissioner had the right to hire Ferderer, supervise her work, and exercise control over other aspects of the employment relationship does not somehow change this reality. The securities commissioner is simply acting as an officer of the state when she performs these activities pursuant to the authority granted, and the limitations imposed, by the legislature, and also subject to the supervision of the governor.[4]

---

[4] It is of no surprise to the court that one of the first things that Karen Tyler did in this case upon being advised of the assault upon Ferderer was to contact the governor's office, which contact resulted in an investigation being commenced, the use of North Dakota Highway Patrol officers to monitor Reinbold's movements, and the exertion of pressure that ultimately resulted in his resignation.

Further, for Title VII purposes, the court can discern no reason for reaching a different conclusion. There are several reasons why this is so.

Under, the legislative history to the 1972 amendments to Title VII, which added public employees to its coverage, expresses concern for the millions of public employees that previously were not afforded the protections of Title VII. And, while the legislative history makes reference specifically to state employees, there is not one hint of a concern about Title VII being applied to offices and departments within the state that employ less than fifteen persons. H.R. Rep. No. 92-238 (1971); S. Rep. No. 92-415 (1971).

The Supreme Court in Arbaugh stated that the numerical threshold of Title VII was enacted to "spare very small businesses from Title VII liability. . . ." 546 U.S. at __, 126 S.Ct. at 1239. Obviously, the burdens that Title VII might impose upon very small businesses are not a concern for individual offices and departments within a state's executive branch given the resources that the offices and departments have to draw upon.

Further, applying the numerical threshold to individual offices and departments would be a significant loophole, particularly in smaller states like North Dakota, even though the State employs thousands of people. For example, it is doubtful whether the governor's office in North Dakota would meet the fifteen-person threshold. And, something seems wrong about applying Title VII's requirements to a small private business employing fifteen persons and not to the office of the chief executive of the State of North Dakota, who has supervisory responsibility over thousands of employees, who has access to significant financial resources, and who can seek advice from the personnel specialists at HRMS and legal advice from the attorney general's office.

Second, the Supreme Court noted in Dothard v. Rawlison, 433 U.S. 321 (1976) that "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike." Id. at 331-332 n14. The court is not aware of any cases in which large employers, like General Motors or Microsoft, are permitted to argue that separate company divisions and departments, to whom immediate responsibilities for personnel matters have been delegated (such as hiring, firing, supervision, setting of work rules, etc.) would be permitted to argue that they should be considered separate employers for Title VII purposes.

Third, holding the State accountable does not mandate that it centralize all of its employment functions and policies. Rather, it simply makes the State accountable if any of its separate agencies and departments adopt or carry out policies in a manner that results in violations of Title VII. At least in North Dakota, this is no different from the State's handling of its liability with respect to other matters, including liability for torts and for violations of North Dakota's Human Rights Act that provides protections against discrimination similar to those found in federal law, including Title VII.

Fourth, recognizing that the State is, in reality, Ferderer's employer is not somehow unfair. In addition to the points already discussed, the legislature has the ability to require implementation of minimum policies and procedures if individual State offices and agencies are running afoul of Title VII's requirements. The Supreme Court in Faragher v. Boca Raton, 524 U.S. 775 (1998) emphasized that the primary objective of Title VII "is not to provide redress but avoid harm." Id. at 806. Also, the Court noted the following:

> As long ago as 1980, the EEOC, charged with the enforcement of Title VII, 42
> U.S.C. § 2000e-4, adopted regulations advising employers to "take all steps
> necessary to prevent sexual harassment from occurring, such as . . . informing
> employees of their right to raise the issue of harassment.

33

Id.  Placing responsibility for compliance with Title VII where the ultimate power and authority resides fosters these goals.  Further, it would help insure that the working environment is not hostile in situations, such as presented in this case, where public employees from different agencies office in the same building and make use of shared state facilities.

Nevertheless, even if the court is wrong in concluding that the State is Federer's employer for Title VII purposes, the court concludes that, at the very least, the State is a co-employer so that the securities commissioner and the State (or at the very least the executive branch under the control of the governor) should be aggregated for purposes of satisfying the fifteen-person numerical requirement and for purposes of imposing any liability.  Cf. Graves v. Lowery, 117 F.3d 723 (3rd Cir. 1997) (holding that the county was a co-employer or a *de facto* employer of clerk of courts that nominally were employees of the state unified court system using the four-factor NLRB test).  Given the pervasive involvement of the State in Federer's employment relationship, the court would reach this conclusion under either the Eighth Circuit's NLRB test or the test adopted by the Eleventh Circuit in Lyes.

In reaching the conclusion that the State, and not the securities commissioner, is Federer's employer for Title VII purposes, the court is aware of Sixth Circuit's decision in Sutherland v. Michigan Department of Treasury, 344 F.3d 603 (6th Cir.  2003), which was not cited by either party. In that case, the Sixth Circuit concluded that the Michigan Department of Treasury was the plaintiff's sole employer for Title VII purposes and not the State of Michigan.  In reaching this conclusion, the court stated the test for determining who is the employer "involves an examination of whether the alleged employer exercises control over the manner and means of the plaintiff's work" and cited for authority Nationwide Mut.  Ins.  Co.  v.  Darden, 503 U.S. 318, 323 (1992).  Id.

34

at 612.  The court then concluded that the Department of Treasury was the sole employer because it retained "the sole authority to appoint, hire, fire, and promote eligible employees to positions within that agency" and because it controlled "the manner and means by which its employees' work is accomplished." Id.

Sutherland is distinguishable from this case on several grounds.  First, the State of North Dakota, apparently, exerts much more control over the employment relationship than the State of Michigan, including imposing limitations on an agency's ability to fire an employee.  Also, the State of North Dakota treats persons employed in the various office and agencies as "state employees." Second, at least for determining whether the State in this case is a co-employer, the Eighth Circuit employs a different test, *i.e.* the "NLRB test", than the Sixth Circuit.

Finally, with all due respect to the Sixth Circuit's decision, the court in that case did not address the issue in terms of factors such as who, under state law, would be the real party defendant for a suit for money damages in tort or for discrimination under any state civil rights laws.  Further, the court did not consider the issue in terms of Title VII's legislative history and the goals and policies that Title VII attempts to achieve.

### C.    Whether Reinbold's conduct was sufficiently severe or pervasive to give rise to a hostile work environment claim

In making a Title VII claim for sexual discrimination based on a hostile work environment, it not enough for Ferderer to prove that she was sexually harassed.  She must also prove that the harassment was so severe or pervasive that it affected a term, condition, or privilege of employment.  In Nitsche v. CEO of Osage Valley Elec. Co-op, 446 F.3d 841, 845 -847 (8th Cir. 2006), the court summarized this element and what must be proved as follows:

> "Harassment affects a term, condition, or privilege of employment if it is

'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998) (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). [Plaintiff] . . . must clear a high threshold to demonstrate actionable harm, for "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of *846 abusive language, gender-related jokes, and occasional teasing" obtain no remedy. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation omitted). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787, 118 S.Ct. 2275 (citation omitted). To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant. *LeGrand,* 394 F.3d at 1101 (citation omitted). Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan,* 348 F.3d 714, 720 (8th Cir.2003) (quoting *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 967 (8th Cir.1999)). Such standards are demanding, for "Title VII does not prohibit all verbal or physical harassment" and is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In determining whether a work environment was sufficiently hostile or abusive, we examine the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Given the foregoing, and prior Eighth Circuit precedent, this presents a close issue.

Giving full deference to Ferderer's allegations with respect to the first incident, there is more than sufficient proof for the jury to conclude that Reinbold's assaultive behavior was unwelcome and that it amounted to sexual harassment. But, if only the first incident had occurred, it may have not been enough to have affected a term or condition of employment sufficient to create a hostile work environment, particularly given Ferderer's deposition testimony that she did not expect it would happen again and the evidence suggesting she treated it as an isolated event.

At least with the occurrence of the second incident, the court believes that the evidence, when construed most favorably to Ferderer, is sufficient to create a jury question as to whether she

36

was subjected to conduct that was severe or pervasive enough on an objective basis to impose liability.  In reaching this conclusion, the court notes in particular the following:

- the fact that the two incidents of unwelcome assaultive behavior, accompanied by verbal sexual advances, occurred within a short period of time.

- the fact the second incident involved additional elements of force, *i.e.*, Reinbold not only allegedly kissed her hard on the mouth twice, but he also forcefully grabbed her head to accomplish this with Ferderer struggling to push him away and yelling "no" she did not want to do this.

- the fact that the kissing of Ferderer twice on the mouth during the second incident created the potential for the exchange of bodily fluids and was intimate in nature.

- the fact that the assault took place in the elevator, a confined space, and out of sight of the public.

See, e.g., Mooring v.  Arkansas Department of Corrections, 243 F.3d 452 (8th Cir.  2001) (single incident in a motel room on an out-of-town trip involving sexual advances, the touching of a thigh, and the attempt to kiss); Hostetler v.  Quality Dining, Inc., 218 F.3d 798 (11th Cir.  2000) (limited incidents of kissing and an attempt to remove a bra apparently from outside the clothing sufficient to create a fact issue overruling the trial court's dismissal of the action);  Prindle v. TNT Logistics of North America, 331 F. Supp. 2d 739, 750-751 (W.D.Wis 2004) (one breast touching incident sufficient); Ferguson v.  Chicago Housing Authority, 155 F. Supp. 2d 913 (N.D.Ill.  2001) (repeated but limited acts of verbal sexual advances and unwanted touching); Fall v. Indiana Board of Trustees, 12 F. Supp. 2d 870, 878-871 (N.D.Ind.  1998) (one incident of forceful kissing, including forcing of the tongue in the mouth, and the groping of the breasts held sufficient) (also reviewing

other cases on this point); <u>Barrett v. Omaha Nat'l Bank</u>, 584 F. Supp. 22, 24, 30 (D.Neb. 1983) (an incident of physical touching inside the confined space of an automobile held sufficient although liability denied on other grounds), <u>aff'd</u>, 726 F.2d 424 (8th Cir. 1984).

Further, the court also concludes that there is sufficient evidence with the addition of the second assault to satisfy the subjective component. In addition to the above evidence, Ferderer immediately reported the second incident and there is evidence that Ferderer lost sleep and was emotionally traumatized by the incident. In fact, when she was interviewed by the North Dakota Highway Patrol almost a week later, the interviewer reports Ferderer as having tears in her eyes and that she was trembling. Also, there is evidence that the assault may have contributed to a return of symptoms from her multiple sclerosis that Ferderer claims had been in remission or dormant up to that point.

**D.**     **Additional State arguments as why it cannot be held liable**

Ferderer appears to be proceeding under the theory that Reinbold should be treated as a co-employee or a third party, and not as a supervisor, for Title VII purposes. In order to prevail on a claim of hostile work environment created by co-employees or third parties, Ferderer must prove, among other things, that her employer knew or should have known of the harassment and failed to take prompt and effective remedial action. <u>E.g.,</u> <u>Tatum v. Arkansas Department of Health</u>, 411 F.3d at 959. The remainder of the State's arguments on summary judgment have to do with this element and are best considered in the context of theories that Ferderer is advancing to satisfy this element.

However, before turning to these theories, it appears that Ferderer concedes the State took prompt action following the occurrence of the second incident and used proper investigation procedures. Also, it appears she agrees that the remedial action taken was also effective, although

the court is less certain of this.  Nevertheless, for purposes of the court's remaining comments, it will be assumed that  the action taken by the State following the second incident was both reasonably prompt and effective.

One of Ferderer's theories in this case is her argument that the State knew, or should have known, that Reinbold was a serial harasser prior to the assaults upon Ferderer.  But, even if there was some uncertainty with regard to this point, she is arguing that the call from Lillis to Commissioner Clark reporting the first Ferderer incident should have tipped the balance and prompted action.

The State argues it cannot be held liable on this basis for several reasons.  One of the State's arguments is that no one at the PSC possessed sufficient actual knowledge to reasonably cause it or one of its officials to take action.  The court disagrees. Without reciting all of the previously stated evidence, there was actual knowledge on the part of Commissioner Wefald and the PSC's former executive secretary of at least one prior situation in which Reinbold was likely harassing an employee within the PSC.  Further, there is also evidence from which the jury could conclude that Mielke was aware of other incidents, albeit older.  Further, apart from the actual knowledge within the possession of these persons, there is also evidence from which the jury could conclude that the PSC had constructive knowledge given the number of prior incidents and other knowledge that was held by lower-level supervisors.

In short, the court concludes there are fact issues for the jury as to whether one of the commissioners or executive-secretary Mielke possessed sufficient knowledge, actual or constructive, that action should have been taken.  See e.g. Hall v.  Gus Construction Co., 842 F.2d 1010, 1016 (8th Cir.  1988); Prindle v.  TNT Logistics of North America, 331 F. Supp. 2d at 752; Fall v.  Indiana

39

University Board of Trustees, 12 F. Supp. 2d at 881-884. At this point, the court will allow Ferderer to present evidence on this theory both with respect to whether action should have been taken prior to the first Ferderer incident and also on the theory that action should have been taken, at the very least, following the first Ferderer incident, even though the time period between the first and second incidents was relatively short. As to the timing issue, the jury could conclude that the second incident could have been avoided had Reinbold been immediately confronted with the accusations that were being made and that it was unreasonable for the PSC officials not to have done at least that much. Perhaps, other conclusions are also possible.

Another argument of the State is that there is no authority for imputing knowledge within the PSC to the securities commissioner. However, the court has already concluded that the State is Ferderer's primary employer for Title VII purposes or, at the very least, is a co-employer. Consequently, the knowledge need not be imputed to the securities commissioner in order to make out a *prima facie* case.

The State also argues that the actual or constructive knowledge within the PSC cannot be imputed to the State, or at least the executive branch under the control of the governor, because the PSC commissioners are publically elected and the PSC is a separate entity, even if the securities commissioner is not. While it is true the PSC commissioners are constitutionally-elected officers, and that the governor may not have the same degree of supervisory authority over them as he does the securities commissioner, the PSC is not a separate legal entity under state law and the PSC commissioners are executive officers of the State over whom the legislature retains significant control in terms of defining their jurisdiction, imposing operating requirements, and telling the commissioners how much money they can have and what they can, or must, spend it on.

For example, the legislature provides for the PSC's offices and equipment payable out of the general fund  (§ 49-01-2); the legislature sets the salary of the commissioners and commands that any fees they earn must be paid over to the state treasurer and credited to the general fund of the State (§ 49-01-03); the legislature commands that the attorney general is obligated to represent the PSC in all proceedings (§ 49-01-09) and that any action the PSC institutes to compel obedience to its orders must be brought in the name of the State (§ 49-02-02(4); and legislature requires that the commission prepare a biennial report for submission to the governor and the secretary of state (§ 49-01-18).  In addition to these specific points, the persons employed within the PSC are "state employees" for reasons discussed earlier.  Further, North Dakota law does not contain any provision for being able to sue the PSC separately for money damages.  As with the securities commissioner and all other state offices, departments, and agencies, a suit for money damages is a suit against the State.

In other words, the PSC is a part of the State just as is the office of the securities commissioner.  Consequently, there is no principled reason why the knowledge of the PSC cannot be imputed to the State, or even more fundamentally, why the PSC's actions and inactions should not be considered the State's actions or inactions.

Still another argument of the State is that there was nothing that could practically be done even if the knowledge of the PSC is attributable to the State.  The State argues there was no person the PSC could have reported Reinbold's conduct to who had any authority over him because he could only be removed from office by impeachment.

The court disagrees and believes, at this point, there is at least a fact issue regarding what action the State could have taken in terms of the jury's consideration of whether the state failed to

take effective action.  And, for proof of that, the court needs only look to what the governor's office and others did in this case once an investigation was conducted.  Among other things, the governor's office pressured Reinbold to resign.  Further, aside from what action could be taken against Reinbold, there certainly was action that could be taken to protect Ferderer and the other state employees.  And, in fact, such action was taken.  Ferderer's job duties were altered so as to limit her future contact with Reinbold at least while she was within the Capitol.  Further, she was given a cell phone so she could call for help.  Finally, there is evidence that the Highway Patrol was tasked to monitor Reinbold while he was on the Capitol grounds to provide a measure of protection to both Ferderer and other State employees.[5]

Another theory of liability that Ferderer is pressing in this case, which does not focus upon what the PSC knew or should have known, is her argument that the failure of the securities commissioner (or the State generally) to have in place a sexual harassment policy applying to her is enough to make out a *prima facie* case. More specifically, Ferderer's argument is that, if there would have been a sufficient policy in place, Ferderer, and possibly also Lillis, would likely have

---

[5]  The court is not sure why the State would want to go down the road of saying that Reinbold was such high level officer that nothing practically could be done to control his conduct.  In Burlington Industries v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held that general agency law should be looked to determine the liability of employers for the acts of their supervisors, including particularly Restatement of Agency (Second) § 219(2) (1957), which sets forth the circumstances under which a master should be held responsible for the torts of his servants.  Id. at 754-759. The provision most commonly relied upon is subsection (b) which imposes liability when the master has been negligent or reckless.  However, another principle is that set forth in subsection (a), which holds the master responsible for conduct the master intended.  The Supreme Court explained that this subsection "addresses direct liability, where the employer acts with tortious intent, and indirect liability, where the agent's high rank in the company makes him or her the employer's alter ego."  Id. at 758.

In this case, Reinbold was one of a handful of executive offices that the State's constitution requires selection by the electorate and a fundamental characteristic of public office is that involves the exercise of some portion of the sovereign power of the state.  63C Am. Jur. 2d Public Officers and Employees § 3.  Consequently, an argument that Reinbold was of sufficient rank to make the State responsible for his conduct as the State's alter ego, even though Reinbold was not Ferderder's supervisor, is certainly not frivolous.  On the other hand, there would be policy arguments for not imposing this kind of liability on a state in this situation.

acted differently in terms of reporting what had occurred and that this likely would have resulted in action that would have prevented the second incident.

There is authority that an employee can satisfy the "knew or should have known" element by failing to have in place an appropriate anti-discrimination policy. E.g., Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 334 (4th Cir. 2003); see Faragher v. Boca Raton, 524 U.S. at 808-809. However, before the court would allow that theory to be presented, there would have to be some basis for a jury being able to conclude that the failure to have a policy in place was a proximate cause of the plaintiff's exposure to the harassment. See id.

In this case, there are facts in dispute regarding why Ferderer did not report the first incident to Commissioner Tyler. Construing the evidence most favorably to Ferderer, one of the reasons may have been that she believed action was going to be taken by the PSC as result of her conversations with Lillis. Another may be that she was fearful of coming forward. Also, it could be a combination of these reasons.

The HRMS has in place policies and guidelines with respect to sexual harassment that can be used by the State's agencies and departments. See Hammeren Dep., ex. 5, p.18. One of the guidelines that is touted as being important to an effective policy is allowing the employees to make complaints informally and on a confidential basis. The court believes that a jury could conclude that had this type of policy been clearly communicated to Ferderer, she may have reported the first incident to Commissioner Tyler when it occurred. There might also be other possibilities. At this stage, the court is not inclined to foreclose the ability of Ferderer to proceed on this theory.

Finally, Ferderer also appears to be claiming that earlier action would have been taken had the PSC had in place a policy that provided clearer guidelines as to what supervisors should do in

the event of discrimination by one of the commissioners.  Also, there may be an issue regarding whether the PSC's existing policy was properly enforced given the knowledge that lower-level supervisors had with respect to other incidents that appears not to have been followed up on.  At this point, the court is reluctant to foreclose these theories given the state of the evidence before the court.

## III.   CONCLUSION

Based on the foregoing, the State's motion for summary judgment (Doc.  No.  29) is **DENIED**.

Dated this 22nd  day of August, 2006.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge

44